# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| SHAYA EIDELMAN, <br> on behalf of himself and all others similarly <br> situated, <br><br>             Plaintiff, <br><br>             v. <br><br> THE SUN PRODUCTS CORPORATION <br> AND COSTCO WHOLESALE <br> CORPORATION, <br><br>             Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 16-cv-03914-NSR <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

_____


### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
### TO DEFENDANTS' DAUBERT MOTION TO EXCLUDE
### <u>PLAINTIFF'S EXPERT WITNESSES</u>


**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
By:  Gary S. Graifman, Esq.
Melissa R. Emert, Esq.
Jay I. Brody, Esq.
16 Squadron Blvd., Suite 106
New City, New York 10956
Telephone: (845) 356-2570

*Attorneys for Plaintiff and
Proposed Class*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT............................................................................1

LEGAL STANDARD........................................................................................1

ARGUMENT..................................................................................................2

    I.      THE REPORT OF DR. JOEL DEKOVEN IS BOTH RELIABLE AND
RELEVANT..........................................................................................2

          A.     The DeKoven Report is Reliable..........................................................3

          B.     Dr. DeKoven Offers a Dermatological, Not a Marketing, Opinion
Which is Relevant to the Issue of False and Deceptive Product
Labeling...........................................................................................7

    II.     BOEDEKER'S CONJOINT ANALYSIS IS NOT ONLY
ADMISSIBLE BUT HAS BEEN ACCEPTED IN THE CURRENT
FORM INNUMERABLE TIMES AS VALID.........................................9

          A.     The Conjoint Analysis As Proposed By Mr. Boedeker Is A
Proper Methodology.........................................................................9

          B.     Defendants' Attempts to Quibble With Various Aspects of
The Proposed Conjoint Analysis Must Be Rejected..................12

          C.     The Proposed Conjoint Analysis Need Not be Completed
Prior to Class Certification..........................................................13

          D.     Defendants Cases Are All Distinguishable................................15

          E.     Defendants' Other Challenges Are Plain Wrong or Go to
Weight............................................................................................17

    III.    The Expert Report of Robert Wallace is Both Reliable and Proper
....................................................................................................19

          A.     Reliance and Purchase Motivation are Not Elements of Class
Typicality or Plaintiff's Claims..................................................20

          B.     The Wallace Survey Sample is Not Overboard..........................21

          C.     Defendants' Attacks on the Wallace Survey Control Group,
Approximation of Market Conditions, and Survey Questions

Go Only to the Weight of the Evidence—Not to its
Admissibility....................................................................22

D.    Wallace's Expert Opinions on Defendants' Marketing Intent
and Consumer Perception are Admissible...............................25

CONCLUSION.......................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Case**                                                                                                           **Page(s)**

*Bayoh v. Afropunk LLC*,
   2020 WL 6269300 (S.D.N.Y. Oct. 26, 2020)...................................................................25

*Borawick v. Shay*,
   68 F.3d 597 (2d Cir.1995)...............................................................................................2

*Broomfield v. Craft Brew Alliance, Inc.*,
   2018 WL 49512519 (N.D. Cal. Sept. 15, 2018)...........................................................12

*Chen-Oster v. Goldman Sachs & Co.*,
   114 F. Supp. 3d 110 (S.D.N.Y. 2015) ..............................................................................1

*Comcast Corp. v. Behrend*,
   133 S.Ct. 1426 (2013) ....................................................................................................13

*Conopco, Inc. v. Cosmair, Inc.*,
   49 F. Supp. 2d 242 (S.D.N.Y. 1999) .............................................................................22

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .........................................................................................................1

*de Lacour v. Colgate-Palmolive Co.*,
   338 F.R.D. 324 (S.D.N.Y. 2021).....................................................................................14

*Eidelman v. Sun Prod. Corp.*,
   2017 WL 4277187 (S.D.N.Y. Sept. 25, 2017) .............................................................7, 8

*Eidelman v. Sun Prod. Corp.*,
   2022 WL 1929250 (2d Cir. June 6, 2022)......................................................................20

*Fane v. Zimmer, Inc.*,
   927 F.2d 124 (2d Cir. 1991) .............................................................................................9

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   2015 WL 539489 (S.D.N.Y. Feb. 10, 2015) .................................................................24

*Ferguson v. Schindler Elevator Corp.*,
   2008 WL 11363261 (W.D.N.Y. Dec. 4, 2008) ..............................................................23

*Fitshenry-Russell v. Dr. Pepper* Snapple Group, Inc.,
    326 F.R.D. 592 (N.D. Cal. 2018) .................................................................. 16

*Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*,
    221 F. Supp. 2d 457 (S.D.N.Y. 2002) .......................................................... 22

*Frye v. United States*,
    293 F. 1013 (D.C.Cir.1923) ........................................................................... 2

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
    317 F.R.D. 374 (S.D.N.Y. 2016) ...................................................... 1, 13, 20

*Hadley v. Kellogg Sales Co.*,
    324 F.Supp.2d 1084 (N.D. Cal. 2018) .................................................*passim*

*Hasemann v. Gerber Prod. Co.*,
    331 F.R.D. 239 (E.D.N.Y. 2019) .................................................................. 12

*Hawes v. Macy's Stores West, Inc.*,
    2022 WL 194407 (S.D. Ohio Jan. 22, 2022) ................................................ 12

*In re ConAgra Foods*,
    302 F.R.D. 537 (C.D. Cal. 2014) .................................................................. 17

*In re ConAgra Foods, Inc.*,
    90 F. Supp. 3d 919 (C.D. Cal. 2015) ............................................................ 17

*In re Dial Complete Mktg & Sales Prac. Litig.*,
    320 F.R.D. 326 (D.N.H.. 2017) ........................................................ 10, 12, 16

*In re Elysium Health-ChromaDex Litig.*,
    2022 WL 421135 (S.D.N.Y. Feb. 11, 2022) ........................................... 21, 22

*In re Fosamax Prods. Liab. Litig.*,
    645 F.Supp.2d 164 (S.D.N.Y.2009) ............................................................... 6

*In re General Motors LLC Ignition Switch Litig.*,
    407 F.Supp.3d 212 (S.D.N.Y. Aug. 6, 2019) ............................................... 15

*In re Kind LLC "Healthy and All Natural Litig.*,
    337 F.R.D. 581 (S.D.N.Y. Mar. 24, 2021) ................................................... 14

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
2008 WL 1971538 (S.D.N.Y. May 7, 2008) ................................................... 6

*In re Mirena IUD Prod. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) .................................................... 3, 7

*In re MyFord Touch Consum. Litig.*,
291 F.Supp.3d 936 (N.D. Cal. 2018) ................................................ 12, 16

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) ........................................... 3

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016) ................................................................ 1

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) ......................................................... 13

*In re U.S. FoodSer v. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) ................................................................ 1

*In re Zyprexa Prod. Liab. Litig.*,
2009 WL 1357236 (E.D.N.Y. May 12, 2009) ....................................... 4, 5

*Jimenez v. Supermarket Serv. Corp.*,
2002 WL 662135 (S.D.N.Y. Apr. 22, 2002) ............................................ 9

*Keegan v. Am. Honda Motor Co., Inc.*,
284 F.R.D. 504 (C.D. Ca. 2012) ........................................................... 1

*KS Trade LLC v. Int'l Gemological Inst., Inc.*,
190 A.D.3d 556 (N.Y. App. Div. 2021) ................................................. 8

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ...................................................................... 2, 9

*Kurtz v. Kimberly-Clark Corp.*,
414 F. Supp. 3d 317 (E.D.N.Y. 2019) .................................................. 13

*Mancuso v. Consol. Edison Co. of New York*,
967 F. Supp. 1437 (S.D.N.Y. 1997) ..................................................... 4

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir. 1995) ..................................................................................4, 7

*McNeilab, Inc. v. American Home Products Corp.*,
  848 F.2d 34 (2d Cir.1988) ........................................................................................22

*Milliman v. Mitsubishi Caterpillar Forklift Am., Inc.*,
  594 F. Supp. 2d 230 (N.D.N.Y. 2009) ..............................................................2, 3, 6

*Price v. L'Oreal USA, Inc.*,
  2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) ........................................................26

*Rand v. Volvo Fin. N. Am., Inc.*,
  2007 WL 1351751 (E.D.N.Y. May 8, 2007).......................................................23, 24

*Rexall Sundown, Inc. v. Perrigo Co.*,
  651 F. Supp. 2d 9 (E.D.N.Y. 2009) .........................................................................26

*Saavedra v. Ely Lilly & Co.*,
  2014 WL 7338930 (C.D. Cal. Dec. 19, 2014)..............................................13, 15, 16

*Schering Corp. v. Pfizer Inc.*,
  189 F.3d 218 (2d Cir. 1999) .....................................................................................22

*Stagl v. Delta Air Lines, Inc.*,
  117 F.3d 76 (2d Cir.1997) ...........................................................................................6

*Sterling Drug, Inc. v. Bayer AG*,
  14 F.3d 733 (2d Cir. 1994) .......................................................................................22

*Stutman v. Chemical Bank*,
  95 N.Y.2d 24 (2000)....................................................................................................8

*Suchanek v. Sturm Foods, Inc.*,
  2017 WL 3704206 (S.D. Ill. Aug. 28, 2017)............................................................14

*Sykes v. Mel. S .Harris & Assoc., LLC*,
  780 F.3d 70 (2d Cir. 2015) .......................................................................................13

*Trouble v. Wet Seal, Inc.*,
  179 F. Supp. 2d 291 (S.D.N.Y. 2001) ..........................................................21, 22, 24

*Universal City Studios, Inc. v. Nintendo Co.*,
 746 F.2d 112 (2d Cir. 1984) ........................................................................... 25

**Rules**

Fed. R. Evid. 702(b) ............................................................................................. 3
Federal Rule of Evidence 403 ............................................................................. 22
Federal Rule of Evidence 702 ............................................................................... 1

**Other Authorities**

*Harrison v. Ford Motor Co.*, Case No. 11-0840,
 2013 U.S. Dist. LEXIS 85137, at *23 (N.D.N.Y. June 18, 2013) ................................. 2

## PRELIMINARY STATEMENT

This memorandum of law is submitted by plaintiff in opposition to Defendants' Motion to Exclude Plaintiff's expert witnesses as embodied in the reports of Stefan Boedeker ("Bdkr. Rep."), Joel G. DeKoven, MD. ("DeK. Rep.") and Robert Wallace ("Wallace Rep."). Defendants do nothing more than carp on non-issues as a matter of law or seek to raise such issues that Courts in this district and elsewhere hold go solely to weight. The motion should be denied.

## LEGAL STANDARD

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993) ("*Daubert*"), a district court serves "as a 'gatekeeper' to ensure that the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *In re Pfizer Inc. Sec. Litig*., 819 F.3d 642, 658 (2d Cir. 2016) (citations and quotations omitted). "The inquiry is, however, flexible—including *how* to determine reliability with regard to the case at issue." *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 386 (S.D.N.Y. 2016) (citing *In re Pfizer*, at 658).

Although the Supreme Court and Second Circuit have "not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," *In re U.S. FoodSer v. Pricing Litig*., 729 F.3d 108, 129-30 (2d Cir. 2013), courts in this Circuit have held that the "scope of the *Daubert* analysis is cabined by its purposes at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirement of Rule 23." *Chen-Oster v. Goldman Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (emphasis added in part). *See also Keegan v. Am. Honda Motor Co., Inc*., 284 F.R.D. 504, 515 (C.D. Ca. 2012).

More generally, "the rejection of expert testimony is the exception rather than the rule." *Harrison v. Ford Motor Co.*, Case No. 11-0840, 2013 U.S. Dist. LEXIS 85137, at *23 (N.D.N.Y. June 18, 2013); *see also* Fed. R. Evid. 702, Advisory Committee's Note. Courts permit expert testimony so long as it is "reliable" and "relevant[.]" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*). The Second Circuit has held that "by loosening the strictures on scientific evidence set by *Frye* [*v. United States,* 293 F. 1013 (D.C.Cir.1923)], *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence." *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995). "Rather than require parties to conclusively prove the reliability of their expert's testimony, courts should favor the admissibility of 'questionable' expert opinions and depend upon 'the power of the adversary system to test shaky but admissible evidence.'" *Milliman v. Mitsubishi Caterpillar Forklift Am., Inc.,* 594 F. Supp. 2d 230, 238 (N.D.N.Y. 2009) (citing *Borawick*, at 610.).

## ARGUMENT

## I.    THE REPORT OF DR. JOEL DEKOVEN IS BOTH RELIABLE AND RELEVANT

Dr. DeKoven's expert report opines on whether dermatologists would recommend a consumer product which was known to contain the MIT preservative (e.g. AFC+) for people with "sensitive skin." DeK. Rep., at 1. In reaching his opinion, Dr. DeKoven reviewed the available scientific literature on MIT, including expert dermatological opinions as to its standing as a contact allergen and potential to elicit allergic skin reactions in sensitized individuals, as well as current MIT regulations, studies, and reports. *Id.*, 4-8. He concludes that MIT has been widely identified as a major allergen and preservative contact sensitizer, with clear allergic potential. *Id.*, at 9. Given this widespread recognition in the dermatological world, he and the majority of his dermatological colleagues would not recommend consumer products known to contain MIT for those with sensitive skin. *Id.*, at 9-10.

### A.  The DeKoven Report is Reliable

Defendants argue that Dr. DeKoven's expert testimony[1] must be excluded as "unreliable" because it lacks any "testable methodology" or specific "study, experiment or survey," and instead relies upon Dr. DeKoven's research and knowledge of the MIT preservative used[2] in the detergent at issue, and its allergenic effect on sensitive skin. Def. Mem. at 2, 6-9. Defendants incorrectly argue Dr. DeKoven was required to conduct empirical tests on the subject detergent, and without that, his testimony must be excluded. *Id*. at 7.  Courts in the Second Circuit, however, explain "[e]xperts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412, 420-21 (S.D.N.Y. 2016) (reliance on experience as well as a review of relevant scientific literature serves as a proper basis for medical opinions.). Such expert testimony is admissible so long as it is based on "sufficient facts or data." Fed. R. Evid. 702(b); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15053250, at *34 (E.D.N.Y. Oct. 26, 2022) (an expert's testimony should not be excluded under *Daubert* because the expert failed to perform an empirical analysis.); *Milliman v. Mitsubishi Caterpillar Forklift Am., Inc.*, 594 F. Supp. 2d 230, 239 (N.D.N.Y. 2009) ("testing is not necessarily a requirement for the admission of expert testimony.").[3]

---

[1] Submitted as Exh. "11" to Decl. of Gary S. Graifman in Support of Class Certification ("GSG Class Decl.").

[2] Dr. DeKoven refers to the allergen as "MI" or "MCI", but recognizes defendants refer to it as "MIT."  DeK. Rep., p. 7.  We will use MIT for consistency.

[3] While the lack of an empirical analysis may render an expert's opinion insufficient to preclude summary judgment or to certify a class, case law does not support the proposition that such testimony should be excluded under *Daubert*.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15053250, at *34 (E.D.N.Y. Oct. 26, 2022).

Dr. DeKoven's testimony is reliable because he based his opinion on the following factors grounded in scientific study and dermatological experience: 1) review of relevant scientific literature identifying MIT as "major preservative contact sensitizers," including dermatological journals familiar to most dermatologists, notices of the American Contact Dermatitis Society, and academic dermatology meetings in North America and Europe; 2) examination of the epidemiology of contact allergy to MIT over the last decade; 3) studies of elicitation of contact allergic skin reactions to MIT in sensitized individuals; 4) expert dermatological opinions regarding the incidence and prevalence of the MIT contact allergy; 5) current regulations by the European Union concerning for the preservative at issue; and 6) internal documents of defendants (DeK. Rep. at 3-4 and 7-8 and *generally* at 4). *See also McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995) (rejecting argument that because expert had "no experience performing or interpreting air quality studies" he was not qualified to testify.). Dr. DeKoven has both practical experience and necessary academic training to testify whether a product with MIT could or should be recommended for people with sensitive skin. *See id*. [4]  Notably, defendants have failed to submit any expert to rebut Dr. DeKoven's report and their arguments are devoid of any expert support.

Nor do the *Mancuso* and *In re Zyprexa* cases cited by defendant indicate otherwise. (Def. Mem., at 6-7 (citing *Mancuso v. Consol. Edison Co. of New York*, 967 F. Supp. 1437 (S.D.N.Y. 1997) and *In re Zyprexa Prod. Liab. Litig.*, 2009 WL 1357236 (E.D.N.Y. May 12, 2009)).  The *Mancuso's expert's* expertise in the relevant field was "minimal," and his report failed to discuss scientific studies. *Id*, at 1447. By contrast, Dr. DeKoven discusses his scientific sources and

---

[4] Defendant's argument -- that Dr. DeKoven's opinion (see DeK. Rep., at 10) is unsupported, mere conjecture (Def. Mem.., at 9) – is similarly without basis. Dr. DeKoven's expert report explains the MCI/MI preservative's allergenic nature and potential to elicit an allergic contact reaction in those with "sensitive skin," and demonstrates how this was widely known among dermatologists around the world.  DeK. Rep., at 3-10.

explains their findings and applicability to support his expert opinion in this case. *See* DeK. Rep., 3-10. █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████ This is a far cry from the "mere recitation of a list of studies" excluded in *Macuso*. *Id*, at 1447. And while defendant's counsel (without any expert support) may disagree with his analysis and opinion, the question of veracity and weight of the proposed opinion should be left to the jury where, as here, the proposed expert meets the necessary educational and experiential qualifications warranting admissibility of his expert testimony. *See* DeK. Rep., at 2 (Dr. DeKoven's quantifications.).

The holding of *In re Zyprexa* is similarly limited, and not applicable to the facts or expert testimony in this case. There, the expert testimony of a doctor was excluded because the expert failed to carefully apply his scientific opinions to the plaintiffs' particular medical situations with regard to causation. *Id*., at 3. The court was particularly troubled because the expert exhibited a "pattern of disregard of facts," including facts directly undermining his opinion of a causal link between the drug and medical injury at hand. *Id*.

By contrast, Dr. DeKoven offers no medical opinion about the plaintiff, or a causal link between the product and any medical injury. *See* DeK. Rep., *generally*. His expert opinion is limited to whether the product at issue contains MIT, █████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

5

██████████████     Defendants point to no analogous misapplication of the expert's opinion to plaintiff's specific medical condition. *See* Def. Mem. at 6-12.

Defendants also argue that he is unqualified to opine because, in defendants' opinion, the MIT literature which his report reviews and analyzes cannot be applied to the subject detergent despite containing that specific chemical. Def. Mem., at 7-8. These arguments, too, are without merit or legal basis.

Expert qualification "may be based on 'a broad range of knowledge, skills, and training.'" *In re Fosamax Prods. Liab. Litig.*, 645 F.Supp.2d 164, 172 (S.D.N.Y.2009) (citation omitted). Courts within the Second Circuit have "liberally construed expert qualification requirements." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 2008 WL 1971538, at *5 (S.D.N.Y. May 7, 2008). Specifically "[w]ith respect to the scope of an expert's credentials, courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit." *Milliman v. Mitsubishi Caterpillar Forklift Am., Inc.*, 594 F. Supp. 2d at 236 (citation and quotation omitted). Rather, when "well-trained people with somewhat more general qualifications are available, it is error to exclude them." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir.1997).

In this case, Dr. DeKoven's qualifications as a medical doctor, a consultant dermatologist, an Associate Professor in the Department of Medicine at the University of Toronto, and a member of the North America Contact Dermatitis Group make him well-qualified, added to his academic and clinical credentials in the fields of contact dermatitis and complex allergic and work-related skin diseases. DeK. Rep. at 2.  Defendants can point to no basis to exclude him based on his training, experience or qualifications. *Milliman*, at 236; *Stagl*, at 82. Rather, as the Second Circuit has clarified, defendants' "quibble" over Dr. DeKoven's "experience, academic training, and other

alleged shortcomings go to the weight and credibility of an expert's testimony instead of the admissibility of his opinions, and therefore, such issues are best explored during cross-examination. *McCullock v. H.B. Fuller Co.*, 61 F.3d at 1043.

### B. Dr. DeKoven Offers a Dermatological, Not a Marketing, Opinion Which is Relevant to the Issue of False and Deceptive Product Labeling

Defendant also challenge Dr. DeKoven's opinion on the ground that he "has no market expertise and conducted no market research." Def. Mem., at 9. But Dr. DeKoven's analysis seeks to answer a dermatological question, not a market question. He opines that, from a dermatological view, given the widely publicized existing research and studies on the chemical's negative effect as a contact allergen, recommending a product with MIT is dermatologically improper (and implausible) for people with sensitive skin. DeK. Rep., at 3-10. Such an analysis and its conclusion is premised, not on the consumer or medical marketing, which would require an analysis of research or surveys concerning consumer or physician behavior. Rather, his opinion is a medical opinion as to the likelihood and propriety of such a recommendation based on a careful review of relevant dermatological studies and scientific literature. *Id.*, at 3-10; *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412, 420-21 (S.D.N.Y. 2016). Such an opinion is rightly derived from a review and analysis of relevant dermatological studies and literature.  Again, defendants have failed to challenge this with any expert rebuttal opinion.

In this respect, defendant's argument -- that Dr. DeKoven's report is irrelevant because it "does not address whether the Claim is misleading" (Def. Mem., at 12) -- is simply incorrect. This Court has already found that the #1 Recommendation Claim may convey a message that could mislead a reasonable consumer "into believing that the Label indicates that both the brand, and in turn, the brand product bearing the actual Label, are recommended by dermatologists for sensitive skin." *Eidelman v. Sun Prod. Corp.*, No. 16-CV-3914 (NSR), 2017 WL 4277187, at *4 (S.D.N.Y.

Sept. 25, 2017). Such a label would certainly constitute material "false advertising" and a material "deceptive act or practice" in violation of N.Y. Gen. Bus. Law ("GBL") §§ 349/350 if,



   Such a dermatological opinion –whether of Dr. DeKoven and/or the majority of his dermatologist colleagues – is certainly relevant to the pertinent inquiry of the Label Claims' false and misleading nature, and the materiality of that deception.[5] Put differently, Dr. DeKoven's expertise in the class certification context, demonstrates why there is a common issue as to the misleading label since all of the AFC+ product contains MIT.  Going further in the proceedings, it will demonstrate to a jury that, not only was the label misleading in conveying to consumers that the subject detergent was the most recommended by dermatologists (which it was not), but such an alleged Label Claim is further false and materially misleading to consumers because such a dermatological recommendation is impossible, given the contrary dermatological research known to most dermatologists.  For these reasons, such an expert medical opinion will assist the jurors

---

[5] While Defendants have earlier in this case conceded that the detergent in question has, in fact, not been recommended by dermatologists, and instead contended that the Label should be read as limited to a claim about the All Free Clear *brand* itself, as opposed to a particular product, *Eidelman v. Sun Prod. Corp.*, No. 16-CV-3914 (NSR), 2017 WL 4277187, at *2 (S.D.N.Y. Sept. 25, 2017) (citing Def. Reply Mot. to Dismiss, at 5,7 [ECF No. 29] and Def. Mem. at 7-14 [ECF No. 25].), Dr. DeKoven's expert opinion will still inform a jury as to the extent of the deception and how and why such deception was *material* to consumers. *KS Trade LLC v. Int'l Gemological Inst., Inc*., 190 A.D.3d 556, 557 (N.Y. App. Div. 2021) (demonstrating that the challenged statement "misleading in a material way" is an element of GBL §349 [citing *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000)]).

"in deciding the particular issues in the case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156

(1999).[6]  The opinion is admissible. Defendants' motion should be denied.

## II.    BOEDEKER'S CONJOINT ANALYSIS IS NOT ONLY ADMISSIBLE BUT HAS BEEN ACCEPTED IN THE CURRENT FORM INNUMERABLE TIMES AS VALID

### A.  The Conjoint Analysis As Proposed By Mr. Boedeker Is A Proper Methodology

Mr. Boedeker has submitted, in this case, a methodology to determine classwide damages

utilizing a time-tested choice based conjoint analysis. (Exh. 35 to Declaration of Gary S. Graifman

in Support of Class Cert. ("GSG Class Cert. Decl.").  His report ("Bdkr Rep." or "Report")

correctly notes that "[t]he methodology that I have proposed in this report has been approved by

courts as a measure that can quantity economic losses to consumers to a reasonable degree of

economic certainty." (Bdkr Rep. p. 45).  Boedeker accurately indicates he understand the claim as

to the misrepresentation with respect to the #1 recommendation claim and that "Plaintiff and the

putative class members  . . . paid a premium or inflated price to Costco because of the deceptive

label and hence, have been thereby damaged."  (Bdkr Rep. p. 2-3).

His proposed methodology involved developing a choice based survey which utilizes the

various part-worths, *e.g.*, attributes of the product to determine how consumers value the various

parts, involving the #1 Recommendation Claim.  But his methodology does more than merely

determine the willingness to pay.  As he notes at various points, "[t]here is an important difference

---

[6] Defendants cannot dispute that Dr. DeKoven's medical opinion "is presumed not to be within [the] common knowledge and experience of the jury," *Jimenez v. Supermarket Serv. Corp.*, 2002 WL 662135 at *4 (S.D.N.Y. Apr. 22, 2002) (quoting *Fane v. Zimmer, Inc.*, 927 F.2d 124, 131 (2d Cir. 1991)) (quotation omitted). Expert testimony will therefore demonstrate the extent and materiality of the false and misleading Label Claim. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (expert testimony is admissible if it will assist the jurors "in deciding the particular issues in the case.").

between the individual willingness-to-pay and the price actually paid." Bdkr Rep. fn 4.   His survey

methodology accounts for this by utilizing real world pricing data during the class period which is

available and has been produced in discovery in this case.   He further explains:

> The equilibrium price is not the simple average of all consumers' willingness to
> pay.  Rather, the equilibrium price depends on *supply and demand*.  The equilibrium
> price is the price where the *supply curve* (i.e., producer's willingness-to-accept) and
> the demand curve (i.e., consumers' willingness to pay) intersect.  (emphasis added).

(Bdkr Rep., p. 10, ¶25).

Because the parties (and Mr. Boedeker) know the number of units sold by defendants

during the class period for the price alleged, that represents the "actual world" data. (Sec. 2.2 and

2.3 at ¶¶30-36). This is data demonstrates the sales of the product with the deceptive claim.   The

conjoint then determines the price in the "but-for" world which is where consumers consider the

product *without* the misleading claim, the theory being that if the product without the claim is less

attractive or desirable to consumers, they will pay less for the product.  (Bdkr Rep. ¶31).

Section 2.3 of the Report is devoted to consideration of the "supply side" data.  Because

the number of units sold is available, the analysis seeks to determine the price in the "but-for"

world for the same volume of the Detergent that has been "supplied in the actual world (i.e., the

number of units of the Detergent sold with the deceptive and misleading claim) that consumers

would have paid in the but-for world. . . . The supply in the actual and the but-for world is

identical." (Bdkr Rep. pp. 17-18 at ¶37-40).  Courts have held that keeping the actual number of

units constant and then determining what price would be paid in the but-for world, appropriately

accounts for supply side data in the actual world.  *See*, *In re Dial Complete Marketing & Sales

Prac. Litig.*, 320 F.R.D. 326, 336 (D. N.H. 2017); *Hadley v. Kellogg Sales Co.,* 324 F.Supp.2d

1084, 1104-5 (N.D. Cal. 2018); See also discussion at Subd. D, *infra*).  As further explained by

Mr. Boedeker (Report at ¶44):

> To fully compensate all consumers for their economic losses, it is necessary to find the price point on the demand curve that ensures that the same number of units that were sold in the actual world would also be sold in the but-for world.

He further explains the methodology to reach this goal by use of the choice based conjoint analysis (Part 4 of Report). The report discusses the methodology for construction of the survey in Part 4. This includes an "exploratory survey" using the attributes previously conceded by Sun Products in its own marketing report as relevant to consumers (GSG Class Cert. Decl., Exh. 26). He then proposes to engage the survey vendor he regularly works with to construct the full "Choice Based Survey" (Bdkr. Rep. Sec. 4.2). He provides examples of the various attributes he proposes to utilize including "scent and dye," various "function" attributes, "brand," the "#1 Recommendation Claim" (and a group without the Claim) and "price levels." (See pp. 40 through 44).

After completion of the survey, the the resulting preferences or choices are converted into attribute levels or "part-worths" (Bdkr Rep. ¶52). Two statistical models, the Mixed Logit model and Hierarchical Bayesian Estimation, are then used to quantify the part-worths for feature levels "such that the resulting estimated part-worths best predict respondents' preferences or choices from the survey. By adding up the respondents' part-worths for different attribute levels, one can determine the share of respondents that would have purchased the product made up of the different levels of each attribute at a given price." (*Id.*, ¶52). The price reduction needed to compensate for the loss of a feature (or the additional price customers would pay for the inclusion of the feature) can then be calculated…" (*Id.*, ¶53).

Mr. Boedeker 's methodology is set out clearly and concisely and is designed to determine through the use of such part-worths, what price premia consumers place on the #1 Recommendation Claim. The actual execution, as explained in the Report, is to be accomplished

11

upon certification of the class. Mr. Boedeker, based on his extensive experience, opines that "CBC thus enables us to determine the difference in value (measured in dollars or as a percentage of the price in the actual world) that customers place on a liquid laundry detergent with the Claim compared to otherwise identical liquid laundry detergent that does not make the Claim." *Id*., ¶54)

### B. Defendants' Attempts to Quibble With Various Aspects of The Proposed Conjoint Analysis Must Be Rejected

Defendants do not challenge Stefan Boedeker's qualifications. In fact, they admit that a choice based conjoint analysis, such as the type he has outlined, is a reliable way to measure damages attributed to a contested label claim and "is 'a statistical technique capable of using survey data to determine how consumers value a product's individual attributes'" [citation omitted] (Def. Mem. 13).[7] Defendants further concede "a conjoint analysis may reliably estimate a price premium in some cases." *Id*. In addition, defendants do not contest that the claim he seeks to measure the value of as an attribute (e.g., the #1 recommendation label on AFC+), is the correct claim.

Indeed, Mr. Boedeker's conjoint analysis utilizing the "marginal consumer" has been approved numerous times by numerous Courts in the face of a *Daubert* challenge.[8] (For

---

[7]  ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

[8] Some examples follow: *Hawes v. Macy's Stores West, Inc*., 2022 WL 194407 at *5-6 (S.D. Ohio Jan. 22, 2022); *In re Dial Complete Mktg & Sales Prac. Litig*., 320 F.R.D. 326 (D.N.H.. 2017) (approving conjoint analysis to determine price premia involving false advertising of liquid hand soap); *Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 276 (E.D.N.Y. 2019); *Broomfield v. Craft Brew Alliance, Inc*., 2018 WL 49512519 at 14 (N.D. Cal. Sept. 15, 2018) (false advertising beer); *Hadley v. Kellogg Sales Co.*, 324 F.Supp.2d 1084, 1108-9 (N.D. Cal. 2018) (false advertising of cereals); *In re MyFord Touch Consum. Litig*., 291 F.Supp.3d 936

discussion of the "marginal consumer," see Bdkr. Rep., ¶¶ 24-26, 42)

Instead they seek to quibble with attributes of the methodology that either go to the weight of the conjoint analysis or have been rejected numerous times by Courts in this district and elsewhere, including this Court.  The few cases they cite to which rejected conjoint analysis had significant issues not present in this matter.

### C. The Proposed Conjoint Analysis Need Not be Completed Prior to Class Certification

Defendants argue that Boedeker's rather comprehensive Report outlining the conjoint analysis which he will execute in the next phase of the case is flawed because, according to them, he should have completed the execution of the proposed conjoint methodology prior to class certification. Clearly, they are wrong.  As numerous Courts have held, at this stage, plaintiff only needs to show that "damages are *capable* of measurement" on a classwide basis using a method tied to plaintiff's theory of liability.  *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1431 (2013) (emphasis added).  Indeed, this Court has held that the expert need not perform his analysis at the class certification stage.  *Goldemberg* at 394.  This is consistent with other Courts in this district. *Haseman,* 331 F.R.D. 239, 278 (E.D.N.Y. 2019) (citing to *Goldemberg*);  *In re Scotts EZ Seed Litig*., 304 F.R.D. 397, 413 (S.D.N.Y. 2015) ("[N]othing in Comcast requires an expert to perform his analysis at the class certification stage"); *Kurtz v. Kimberly-Clark Corp.,* 414 F. Supp. 3d 317, 332 (E.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded sub nom. Kurtz v. Costco Wholesale Corp.,* 818 F. App'x 57 (2d Cir. 2020) ("plaintiff need not be prepared at the certification stage 'to demonstrate through common evidence the precise amount of damages incurred by each class member'" quoting from *Sykes v. Mel. S .Harris & Assoc., LLC,* 780 F.3d 70, 82 (2d Cir. 2015));

---

968-971 & fn 25 (N.D. Cal. 2018) (rejecting *Saavedra* analysis, explaining "because Mr. Boedeker does consider the supply curve, those cases are distinguishable").

*de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 343-44 (S.D.N.Y. 2021) (plaintiff need not actually perform the damages analysis at the class certification stage); *In re Kind LLC "Healthy and All Natural Litig.*, 337 F.R.D. 581, 603-04 (S.D.N.Y. Mar. 24, 2021) (same).

Defendants then disingenuously mislead this Court by further arguing that Boedeker should not be allowed to complete the conjoint his Report proposes because fact discovery is closed (Def. Mem. 15-16). First, defendants completely ignore this Court's Scheduling Order, entered on Oct. 26, 2017 (*See* Civil Case Discovery Plan and Scheduling Order, ECF 45 at ¶ 18) which directly contradicts defendants and states "[t]he parties propose this discovery schedule through the class certification stage and anticipate that additional merits discovery could take place after, and subject to the Court's ruling on the class certification motion." A copy of the Scheduling Order is annexed to the Graifman Daubert Opp. as Exh. "4." Indeed, this is not unusual, as most courts find this the most practical process. Moreover, the Report was clear as to the methodology Mr. Boedeker proposed to execute (and which has been approved by innumerable Courts), and that the execution phase would be completed after the class is certified, as per the Scheduling Order. Nothing was hidden about that proposed procedure. Defendants conceal the existence of the Scheduling Order in their motion papers. In *Goldemberg*, the same procedure was used by this Court with further discovery proceeding upon certification of the classes there. *See, Goldemberg*, at 403-404. *See also Suchanek v. Sturm Foods, Inc.,* 2017 WL 3704206 at *1 (S.D. Ill. Aug. 28, 2017) (permitting the necessary additional discovery regarding damages post-certification).

Defendants point to no facts which should change that. In any event, the Scheduling Order controls, absent defendants seeking to modify it for good cause, which they have not done. [9]

---

[9] Moreover, it would be a manifestly unfair result if the full conjoint analysis was required to be completed even before the class certification motion was filed. For example, if the individual claims of plaintiffs were dismissed on summary judgment prior to class certification, that would

### D.  Defendants' Cases Are All Distinguishable.

Defendants weakly attempt to raise a few cases in support of their position, which must be rejected.  For example, defendants improperly attempt to rely on the decision in *In re General Motors LLC Ignition Switch Litig.*, 407 F.Supp.3d 212 (S.D.N.Y. Aug. 6, 2019) ("*GM*"), but severely miscast the decision of Judge Furman in *GM* as favorable to them, when in actuality, it supports plaintiff in this case*.  GM* was about a *product defect*, *not* false advertising or a misleading label. The Court noted that distinction in specifically acknowledging that a conjoint analysis is an appropriate methodology to measure classwide damages in certain consumer cases *and in particular, mislabeling cases. Id.* at 238-39, holding:

> One  group  of  these  cases,  for  example,  involved  classic  allegations  of mislabeling. [citations omitted] On the whole, the courts in these cases found that the conjoint analyses "adequately account[ed] for supply-side factors" . . . . *In a classic mislabeling case, however, that makes sense.* A conjoint survey that asks respondents whether they would rather pay *x* for a product labeled "100% Fruit Juice" or *y* for a similar product labeled "50% Fruit Juice," for example, would account for supply-side factors if both *x* and *y* reflect the prices for which juice companies actually sell similarly labeled products in the marketplace. Accounting for supply-side factors is not so simple, however, where the alleged misrepresentations and omissions concern dangerous defects, as in this case. After all, products containing such defects are rarely (if ever) sold (or allowed to be sold by regulators) when the defects are fully disclosed.  (emphasis added).

Thus, defendants improperly attempt to cast the dangerous product defect facts of *GM* as similar to those here in a product mislabeling case. Not so according to *GM*.

Defendants further rely on *Saavedra v. Ely Lilly & Co*., 2014 WL 7338930 (C.D. Cal. Dec. 19, 2014).  However, the issues presented in *Saavedra*, do not exist here, nor in other cases in which Mr. Boedeker submitted the same proposed conjoint methodology he does here.  See *Hadley*

---

mean plaintiffs would be forced to incur that significant cost for a process which would not even be necessary or used.  In addition, if the choice based conjoint were done using one class definition and the Court certified a modified class definition, it might have to be done all over again.

*v. Kellogg Sales Co.,* 324 F.Supp.2d 1084, 1104-5 (N.D. Cal. 2018). In *Hadley*, Judge Koh pointed

out that *Saavedra* rejected the conjoint analysis because the proposed analysis only looked to the

"demand side" of the equation and did not take into consideration any real market data concerning

the supply side.  *Id.*  More significantly, the Court noted that the conjoint before her, done by Mr.

Boedeker (and the same one proposed here), did account for supply side element.  *Id.* at 1105.  In

fact, the Court pointed out that the same proposed conjoint by Mr. Boedeker was also approved in

*In re Dial Complete Marketing & Sales Prac. Litig.*, 320 F.R.D. 326 (D. N.H. 2017) (where the

Court rejected the same challenges as here).  The *Hadley* Court properly grasped the reasoning,

holding that the conjoint in *Dial*:

> adequately "account[ed] for the supply side" because "the supply element of the
> supply and demand price function is fixed" in the analysis "and is set, or
> included, *in the [market] price[s] paid for*" the product at issue. *Id.* at 334. The
> court further noted that the proposed conjoint analysis was "one in which quantity
> (the number of products with the offending claims actually sold) *is held constant* ...
> in determining" the price premium, which means that the conjoint analysis used a
> "quantity" figure that matched the quantity of the challenged product that was
> actually sold during the class period. The court explained that the reason the
> proposed conjoint analysis "held" quantity "constant" in this manner was because
> the conjoint analysis sought to calculate the price premium attributable to the
> challenged labeling statement by first "calculat[ing] the highest price in the actual
> market at which Dial could have sold *the same number* of products without the
> challenged [statement] (all emphasis above added by *Hadley* Court).

*Hadley, supra*, at 1005.

Thus, *Saavedra* is inapplicable as the supply side considerations *are included* in the

methodology proposed by Mr. Boedeker which does not merely examine the "willingness to pay."

*In accord*, *In re Dial, supra at 336; Fitshenry-Russell v. Dr. Pepper* Snapple Group, Inc., 326

F.R.D. 592, 606-07 (N.D. Cal. 2018); *In re MyFord Touch Cons. Litig.*, 291 F.Supp.3d 936, 969-

71 (N.D. Cal. 2018) (approving a nearly identical proposed conjoint analysis from Mr. Boedeker

and finding the conjoint adequately accounted for supply-side factors "by assuming that the supply- the quantity- was fixed").

Defendant strangely cite to the opinion in *In re ConAgra Foods,* 302 F.R.D. 537 (C.D. Cal. 2014). However, that decision was revisited by the Court in *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1021–33 (C.D. Cal. 2015) and the conjoint was approved by the Court as sufficiently accounting for supply factors and being properly stated (rejecting challenges by defendants' expert herein, Dr. Ugone).[10] In *ConAgra*, the initial proposed damages model failed to address the claim at hand (e.g., whether consumers believes the term, "100% Natural" also meant "no GMOs"). That issue was corrected with the proposed conjoint analysis, and the damages model using a survey and conjoint—as Mr. Boedeker proposes here—was accepted by the Court. *Id* at 1025-1032. The damages model was affirmed by the Ninth Circuit. Thus, *ConAgra* fails to support their position.

### E. Defendants' Other Challenges Are Plain Wrong or Go to Weight

Defendants incorrectly suggest that Mr. Boedeker has arbitrarily selected the attributes for his product profiles but fail to actually give examples (Def. Mem. 14). To the contrary he has done this in detail in his Report. (Bdkr. Rep. pp 40-44 and ¶ 27). To the extent defendants challenge those selections, that goes to weight. *ConAgra, supra* 90 F.Supp.3d at 1029 ("The fact that Howlett will select certain product attributes for inclusion in the proposed surveys to the exclusion of others does not render her analysis unreliable"); *In re Dial, supra* at 332-333 (finding the challenge to the type and number of attributes selected by Boedeker go to weight, not admissibility); *Hadley, supra* at 1108 (same); *Fitzhenry-Russell, supra*, at 604 (same). Moreover, there is nothing to

---

[10] *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1021–33 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017), and *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).

prevent him to revisiting those attributes in the execution phase in order to make adjustments if necessary. *Conagra, supra* at 1030 ("Howlett can modify [] the survey model if her belief that consumers ascribe only six meanings to the '100% Natural' claim proves to be incorrect. This adequately addresses Ugone's objection.").

As noted above, defendants in making the usual claim that Mr. Boedeker has not used supply side factors in the conjoint analysis (Def. Mem. 14), vainly throw this perennial challenge at the wall hoping it will stick. But that old saw has been discredited by numerous Courts for the reasons set forth above at length in Subd. D, where those Courts looked at the issue in the context of this specific methodology proposed by Mr. Boedeker directly and rejected it handily.

In addition, defendants seem to ignore the fact that he includes the process of obtaining necessary survey data when proceeding with the conjoint (Bdkr Rep., Part 4, "Proposed Empirical Study Design"). Sun Product's marketing report (GSG Class Cert. Decl., Exh. 26) is undeniability a solid survey of consumers' preferences and is a rational basis for his initial selection of attributes. However, Boedeker's Report makes clear that he also intends to retain the survey entity he regularly works with to obtain a more fulsome survey for the analysis. (Bdkr Rep., Sec. 4.2). Thus, that challenge has no merit.

Finally, defendants wrongly contend that Mr. Boedeker' conjoint analysis would not include "real world pricing data (Def. Mem. 18). Clearly this is not so. In fact, Mr. Boedeker devotes a substantial section to pricing data and lists the pricing attributes as based on real world data (Bdkr Rep., Sec. ¶¶ 121, 124(a) – (c) and Figs. 9 & 10). As stated by Mr. Boedeker at his deposition "I'm going back and I'm looking at a time period which the class [would be] certified . . . . And I'm looking at the transactions that actually occurred." (p. 28:18-22) attached as Exh. "2" to Graifman Daubert Opp. Decl.

18

Defendants' own expert, Ugone has conceded  Indeed, examples of that real world pricing data are submitted as part of plaintiffs' Motion for Class Certification and this Opposition to Defendants' Daubert Motion.[11] Thus, again defendants are incorrect.[12]

In sum, the Report of plaintiff's damages expert, Stefan Boedeker, being identical in form and fashion to those previously approved, the motion to exclude should be denied.

## III.    THE EXPERT REPORT OF ROBERT WALLACE IS BOTH RELIABLE AND PROPER

Robert Wallace's expert report opines on what purchasers of AFC+, the detergent in question, understand the Label Claim ("From the #1 Detergent Brand Recommended by Dermatologists for Sensitive Skin") to mean. Wallace Rep., at 2. To do so, Wallace designed and conducted a survey to test consumer's interpretation of the Label Claim, and then analyzed the survey results along with the product label itself, in opining on the deceptive and material nature

---

[11] 

[12] Defendant inexplicably raises the fact that Plaintiff's counsel explored the prospect of adding the information from the Second Circuit's decision which noted [REDACTED] The issue is a complete red-herring designed to detract from the actual issues extant.

of the Label Claim based on years of experience in the branding industry. *Id.*, at 2, 6-18. Wallace's report also explains all material aspects of his survey design (*e.g.* survey universe, sample size, control, etc.) based on the accepted literature in the field, and summarizes its findings confirming that the Label Claim misled a significant majority of respondents to believe that product was recommended by dermatologists for people with sensitive skin, and served as a strong product purchase driver. *Id.*, at 5, 18.

### A. Reliance and Purchase Motivation are Not Elements of Class Typicality or Plaintiff's Claims

Defendants argue that the survey and opinion Robert Wallace, plaintiff's marketing and survey expert, is flawed because it fails to examine "whether purchasers bought the Product *because* of the Claim." Def. Mem. at 20 (emphasis added). Then, without any legal authority or basis, defendants argue that "[t]his omission renders Wallace's survey unreliable and inapposite." *Id*.

Aside from the absence of any requirement for an expert to address *all* elements of a claim or case, *see supra* n.6 (collecting cases), defendants are simply wrong that any consumer's particular motivation for purchase or reliance on the #1 Recommendation Claim is even at all an aspect of his claims, let alone a determining factor of class typicality. "To the contrary, the New York Court of Appeals has held that reliance is *not* an element of a section 349 [or 350] claim." *Eidelman v. Sun Prod. Corp.*, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022) (citations and quotations omitted). Nor is it an element of unjust enrichment. *Id*. at *2. For this reason, this Court has previously ruled that potentially differing "consumer buying preferences" and reliance on a deceptive label did not preclude class certification, particularly under New York's GBL §§ 349/350 where "it does not matter whether a plaintiff justifiably relied on the deception." *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 392 (S.D.N.Y.

2016).  As a non-element, and thus not a legal issue at play in the case, purchase motivation certainly cannot defeat typicality.

### B.  The Wallace Survey Sample is Not Overbroad

Defendants also contend that the universe of consumer respondents in Wallace's survey is overbroad because it includes consumers beyond the putative class (*i.e.* consumers who purchase detergent at New York Costco stores), and therefore not probative of the issues in the case, and inadmissible as "unreliable." Def. Mem. at 21. This argument flies in the face of accepted law, holding that "questions regarding the appropriate universe to be surveyed goes to the weight of the evidence and not to its admissibility." *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *7 (S.D.N.Y. Feb. 11, 2022) (collecting cases).

More fundamentally, Defendants' argument ignores that "[t]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be likely to mislead a reasonable consumer acting reasonably under the circumstances." *Goldemberg*, 317 F.R.D. at 389 (citation and quotations omitted). Proof of deception turns, not on the perception of *New York* consumers per se, but on whether "an *objective, reasonable consumer* . . . would have been deceived." *Id.*, at 386.  The Wallace Survey demonstrates that respondents were indeed deceived and therefore is admissible evidence of the *objectively misleading nature* of the #1Recommendation as presented on AFC+.

Defendants improperly rely on *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001). First, the Wallace survey did, in fact, question consumers who shop for detergent, and are thus potential purchasers of the detergent in question. Second and more fundamentally, the holding in *Trouble* is distinguishable because the survey was flawed because the products were "never actually used ... to test for confusion" and the questions had "little or no relevance to issues

in the case." *Id*. at 308. Here, the Wallace survey showed survey respondents the Label Claim (*i.e.*, label icon) at issue, and directly questioned their interpretation of that message. Wallace Rep., at 9; *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 221 F. Supp. 2d 457, 461 (S.D.N.Y. 2002) (distinguishing *Trouble*).

### C.  Defendants' Other Attacks on the Wallace Survey Go to its Weight

Defendants offer a slew of attacks against Wallace's survey methodology and various elements, including the selected control group (*e.g.* use of a similar label claim on a toothpaste product), approximation of market conditions (*e.g.* showing consumers an image of the subject Label Claim icon instead of the actual detergent bottle), and the wording on survey questions and responses. Def. Mem. at 21-23; Wallace Rep., at 9-12. However, the law in the Second Circuit is now well-settled. "A party seeking to exclude survey evidence from a jury trial shoulders a heavy burden." *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *2. A survey is probative and should be admitted into evidence to establish actual consumer confusion so long as it is "fairly prepared and its results directed to relevant issues." *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994) (quotations omitted.). Generally, "errors in methodology . . .  go only to the weight of the survey evidence." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999). A survey should only be excluded under Federal Rule of Evidence 403 where it is so flawed in methodology that its probative value is substantially outweighed by its prejudicial effect.[13]  Thus, while Defendants nit-pick at various issues of how the survey was constructed, they make no

---

[13] *In re Elysium,* at *2 (collecting cases). *See also*, *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 221 F. Supp. 2d at 460–61 (noting courts should admit surveys if they are not "devoid of all probative value on the issue of the likelihood of confusion." [quotation omitted.]); *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999) ("A survey is only inadmissible if its flaws destroy all of its relevance." [citing *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988)]).

effective showing that these alleged flaws – all of which are in any event disputed by plaintiff's expert –, are devoid of probative value as to the issue of consumer deception, or that such value is substantially outweighed by any prejudicial effect. See Def. Mem., *generally*.

Moreover, Defendants' strategy of highlighting areas of methodological dispute between the parties' two marketing and survey experts offers no legal basis for expert exclusion under *Daubert*. "It is not for the court to decide which expert opinion is more persuasive. The conflicting opinions 'merely create[ ] a credibility question for the jury to resolve...." *Rand v. Volvo Fin. N. Am., Inc.,* 2007 WL 1351751, *3 (E.D.N.Y. May 8, 2007); *Ferguson v. Schindler Elevator Corp.*, 2008 WL 11363261 (W.D.N.Y. Dec. 4, 2008) (collecting cases). While Defendants' expert has noted alleged methodological flaws in the Wallace survey, Wallace has disagreed and relied upon proper methodological bases for his survey design. *See e.g.*, Wallace Rep., at 6-9 (explaining his survey design, including proper universe, sample size, wording of questionnaire, controls, stimuli, based on the Manual for Complex Litigation and Reference Manual on Scientific Evidence.).

For example, Defendants argue that the survey's control group was flawed because it employed similar label claim stimuli on a toothpaste product, instead of a detergent, which Defendants' expert argues is not sufficiently similar. Def. Mem. at 22. This of course ignores the fact that the difference in products is not the relevant issue being tested in the survey; the purpose of the survey was to determine consumers' perception and understanding of the Label Claim and test whether those messages were materially misleading, while excluding survey "noise." In this sense, the control group in the Wallace Survey shares as many of the key, relevant characteristics with the experimental stimulus as possible, differing only in the "dentists" vs. "dermatologist" reference. Wallace Rep., at 9. Regardless, the issue of proper control group selection is disputed

between the experts, and Wallace's control design was based on widely regarded sources in the literature. *Id.*, at 8-9.[14]

Similarly with the survey stimuli, which showed survey respondents a picture of the Label Claim as presented on the front of the Product bottle, ████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████

On this issue, courts have agreed that "no survey can construct a perfect replica of 'real world' buying patterns." *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d at 308. Instead, in examining the impression presented to the consumer by the product in question, a survey may use stimuli, such as pictures or advertisements that directly expose potential consumers to products in question, and tests for confusion through market simulations. *Id.*

Lastly, defendants challenge various wordings in the survey questionnaire, contending they are "bias" in some unexplained way. Def. Mem., at 22-23. Particularly deficient in defendants'

---

[14] Defendants' citation to the single case of *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 539489, at *5-7 (S.D.N.Y. Feb. 10, 2015) is highly distinguishable. The decision concerns a flawed control group that was needed in order to show "a statistically significant difference between the test group and the control group that would warrant an inference of causation." *Id.* The Wallace Survey, however, was not designed to test causation that, for example, "Medicine [or detergent] X causes rashes" or any other causal result. *See id.* Rather, the survey was designed for the limited purpose of determining consumers' perception and understanding of the Label Claim; Wallace therefore constructed a control group suited for survey at hand, which would eliminate potentially confounding influences in accordance with scientifically accepted designs. Wallace Rep., at 8 (citing Reference Manual on Scientific Evidence).

reasoning is an explanation as to how Wallace's chosen wording misled survey respondents into providing incorrect data, or how or why the wording of defendants' experts would have likely resulted in different responses. *See id*, at 23.[15] In any event, the Second Circuit has expressly permitted surveys to indicate to respondents the existence of a question of fact on the likelihood of confusion, as the Wallace questionnaire does, so long as the survey is "fairly prepared and its results directed to the relevant issues." *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (citations and quotation omitted.).

### D. Wallace's Expert Opinions on Defendants' Marketing Intent and Consumer Perception are Admissible

Defendants argue that Wallace's opinion on defendants' marketing intent in employing the Label Claim in question should be excluded because it is not based on the survey results or any scientific study. Def. Mem. at 23-25. Defendants also take issue with Wallace basing some of his expert opinions on his "extensive experience with consumer' perception on the term 'brand.'" *Id*., at 24; Wallace Rep., at 14. But here, too, defendants ignore well-established law and recklessly cite decisions concerning different matters and different reliability flaws.[16]

---

[15] For example, defendants fault the survey questions for asking respondents to focus on "the label" at issue in this case, but cannot explain how focusing on the product's package as a whole would yield different survey results testing consumers' understanding of the Label Claim messaging. *See* Def. Mem., at 23.

[16] For example, defendants cite to *Bayoh v. Afropunk LLC*, 2020 WL 6269300 (S.D.N.Y. Oct. 26, 2020) which excluded Wallace's opinions on a copyright matter where his analysis lacked evidence to establish causality and damages (*i.e.,* measure of impact of the use of plaintiff's photographs on the defendant's revenues.) *Id*., at 5. These opinions and flaws are not at issue in the Wallace Survey submitted by Plaintiff in this case, which is supported by his survey, analysis of the Label, and years of experience in branding and consumer perception. *See* Wallace Rep, *generally*.

A recent decision in this district explained that an expert's opinion may properly be premised on such expert's experience, rather than based on a scientific study. *Price v. L'Oreal USA, Inc.*, 2020 WL 4937464, at *3-4 (S.D.N.Y. Aug. 24, 2020) (admitting expert opinion in matters which were based on his experience, but excluding his opinion in matters in which he did not claim any experience from which to opine.).

Ultimately, defendant's position must be rejected because "expert reports regarding consumer perception need not be based on scientific surveys . . . experts may testify based on their own experience." *Id*., at 5 (collecting cases).[17]

## CONCLUSION

This Court should deny the entity of Defendants' motion to exclude.

Dated:  February 27, 2023
        New City, New York

        **KANTROWITZ, GOLDHAMER
        & GRAIFMAN, P.C.**

        Gary S. Graifman, Esq.
        Melissa R. Emert, Esq.
        Jay I. Brody, Esq.
        16 Squadron Blvd., Suite 106
        New City, New York 10956
        Telephone: (845) 356-2570

---

[17] Similarly, "materiality need not be proven by extrinsic evidence such as consumer surveys . . . [and] may be proven by showing that the misrepresentation related to an inherent characteristic of the product." *Rexall Sundown, Inc. v. Perrigo Co*., 651 F. Supp. 2d 9, 39–40 (E.D.N.Y. 2009) (citations omitted); *In re ConAgra*, 90 F.Supp.3d at 1018–20.

26